The next matter, number 24-1314, W.R. Cobb Company v. VJ Designs, LLC, et al. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning, and may it please the Court, Robert Fine for the appellant. I recognize that the appellant, I should ask you for two minutes for reserve time. Thank you for rebuttal. I recognize that the appellant has burdens, especially in a non-jury trial, but those tasks are not insurmountable, particularly where the errors of law and fact are so apparent and fundamental. Defendant Benjamin Galili either thought he could transfer the Forevermark license to the joint venture and did not, or he knew he could not and did not. In either event, he kept the money paid by W.R. Cobb in furtherance of the letter agreement and the joint venture, the, quote, failed business arrangement as described by the trial court in the first sentence of its decision. The lower court, however, did not fully understand the letter agreement and a series of errors followed, resulting in denial of plaintiff's claims and the remedy of rescission was not even discussed. The letter agreement forming the joint venture required V.J. Designs to give control of the Forevermark license to the joint venture owned 51 percent by V.J. and 49 percent by W.R. Cobb. Benjamin Galili, the sole owner and principal of V.J. Design, wrote to Forevermark May 18, 12 days before the signing, that, quote, the licensed entity's name will be W.R. Cobb slash V.J. He also testified that the joint venture would hold the Forevermark license. In Mr. Galili's email, he also wrote to Forevermark copying W.R. Cobb, quote, your approval of the possible joint venture is greatly appreciated and this seemed like W.R. Cobb to be a done deal. Without the license, the joint venture could make no sales of Forevermark product. The license was never given to the joint venture. W.R. Cobb paid $290,000 to V.J. That included $15,000 in anticipated profits under the profit sharing portion of the agreement. No license was transferred. Counsel, I'm not clear whether your theory is that the agreement required V.J. to transfer the license at the time of the signing of the agreement. Well, it certainly did. That is the theory. That's the theory. And that is your breach of contract claim. That's right. Well, there are other breaches, but the joint venture. The contract doesn't say that. I believe it. Give me the precise language you are relying on. Well, it says that it would operate the business under the Forevermark license in Arabic number one of the contract. Well, it talks about Fremark, who actually controlled ownership of the license, becoming comfortable, at which point and implied in that is Fremark controlled, not the joint venture, when the license was to be transferred. And at that point when Forevermark became comfortable, then the license would be transferred. Isn't that what the agreement holds? No. There was going to be a two-step process. The license was to be transferred before Forevermark agreed to it? No. The assumption and belief, certainly of W.R. Powell. Well, it may be an assumption, but the testimony at trial was that your client knew that Forevermark controlled the license and it could not be transferred without their consent. And there was a two-step process for the transfer. The first was to the joint venture controlled by V.J. Designs. But even so, V.J. could not transfer the license without Forevermark's consent and your clients knew that. Well, our client... So why does it matter whether it first goes to the joint venture? Well, it does matter to the extent that if Mr. Gallili knew that Forevermark said no to the transfer to the joint venture, then the fundamental purpose of the joint venture was not met and there should be rescission. On your account, why does the contract include the when they get comfortable language? The idea was that V.J. Designs and W.R. Cobb would have this joint venture with V.J. Designs controlling it with 51%. And then after a certain point in time, either sales or performance or whatever, if Forevermark said that they were comfortable with W.R. Cobb, W.R. Cobb or an affiliate would have taken over the 51% ownership interest of V.J. Designs. Do you think it's written to say that? Absolutely, Your Honor. Well, how does it read that way? Well, if I may, and I apologize. Am I right to think this is the essence of your argument hinges on this, us being able to read the getting comfortable language the way you're about to explain we can read it? Well, I think that the short answer is yes. That the idea and the judge got it wrong to assert that our position was that that license just had to be sold to W.R. Cobb. We didn't take that position. There was an intermediate step where it would be a joint venture. Yeah, but I guess if you just how are you reading that language to support your theory? That's what I'm having trouble with. It seems to make it contingent on the judgment by this other entity before any of this gets going. Well, I think that the belief of everyone and Mr. Just so I understand, is the idea that you're not quarreling that the text seems to go against you? Well, yes, I am. So just before we get to what everyone thought, just help me with the English language. What in the words in the contract suggests it can be read as you're trying to read it? Again, Paragraph 1, Appendix 129, Cobb V.J. shall operate a Forevermark business under a Forevermark license. So I don't see how that could be anything other than that joint venture in control and owner. But that's not the only provision. You're still not addressing this get comfortable with language, which according to the record, was provided to counsel for Cobb ahead of time. Well, it was Cobb's goal to, in essence, prove itself to Forevermark so that the license that had been controlled by V.J. would eventually go to W.R. Cobb. And in fact, at the time, May 30, 2018, V.J. signed an undated assignment of its interest to W.R. Cobb. So both sides knew that the plan was that the issue of comfort with W.R. Well, suppose Forevermark never got comfortable. Well, if they never got comfortable, then the joint venture would go on with 51 percent V.J. designs and the profit sharing that was in the contract. And I just want to add, Mr. Kalevi testified. Question, so the joint venture would hold the Forevermark license, correct? His answer was yes. Appendix 439. So that W.R. Cobb felt that the joint venture was a go. But in even saying that the joint venture was a failed business arrangement, the upshot was that if no license was after W.R. Cobb paid $290,000 to V.J. Designs. This is where I'm not great. It says under the agreement, V.J. Designs, 51 percent interest would be assigned to Wenham Enterprises for no cost after Forevermark becomes comfortable with W.R. Cobb. Isn't the word after in the agreement? Yes. And so what's the how? I'm not saying you're wrong. I'm just saying, given that language, how is it the case that the thing you want to have happen? Can happen before Forevermark becomes comfortable? It could not. But W.R. Cobb had to prove itself within the joint venture for Forevermark to become comfortable. In the meantime, and they have a profit-sharing agreement, V.J. Designs and W.R. Cobb would be in the joint venture. Again, with V.J. Designs owning 51 percent of it. But I do want to state that the upshot was that Mr. Gallili was paid $290,000, V.J. Designs was. He pocketed the money, kept the diamonds, kept the license, didn't transfer computer-aided designs, CADs, that were, quote, an important tool in jewelry manufacturing because he did not own them. And that was found to be a misrepresentation by the judge who sloughed it off by saying, well, he might have been able to correct it. So that she did not address the rescission argument, which is our alternative remedy here for the breach of contract. But I want to go back to the the idea of the need to become comfortable. There was the profit-sharing arrangement during the operation of the joint venture with V.J. Designs owning 51 percent. So if Forevermark never became comfortable with that possible second transfer, the joint venture would have continued. It would have gone on. There was no impediment to that. But Mr. Gallili never transferred the license as he was obligated for use of the license. I should be more precise, the use of the license to the joint venture as he was obligated to do. And as he said again, that the joint venture was going to be holding the license. There was one other factual error in the district court's decision that she said that it required, that the letter agreement required W.R. Cobb to provide purchase orders for the inventory. That was a stumbling block in her mind. But the agreement said that the purchase orders would come from the joint venture to V.J. for the purchase of the inventory that V.J. had on hand. That was another further example, I think, of the, frankly, the lack of understanding of the trial court of how this arrangement was going to work. There were clear errors of law under analysis of the contract, under de novo review. And in addition, not even addressing the rescission, although the court, I believe, Appendix 428 declared when Mr. Gallili resigned from the joint venture that that was a notice of rescission. The fundamental goal here was to transfer the license to the joint venture. And that was the essence of this agreement. V.J., the joint venture. Thank you, Counsel. Okay. Thank you very much. Thank you, Counsel. At this time, if Counsel for the Appellee would please introduce himself on the record to begin. Thank you. Attorney Kevin Bristow for the Appellee V.J. Designs, LLC, and Benjamin Gallili. There was no provision in the written contract saying that the Forevermark license would be transferred to the joint venture because that is not how the contract was constructed, and that is not what the design or intent of the parties was at the time that they entered into the contract. Can you just so I understand this? The district court says if the license was to be transferred at the execution of the agreement, there would be no need for a waiting period for Forevermark to become comfortable with WR-COB. Now, as I understand it, the appellant is saying the exact opposite. There still would have been a reason. No, there absolutely would have been no reason had the license been transferred. The name of the new entity, as Counsel read to you from the preamble of the contract, was V.J. Designs slash COB slash V.J. Design. If the license was transferred at the time that the contract was executed, then and at the same time pursuant to that contract, V.J. Designs was required to sign an undated transfer of its 51 percent interest. That is in the contract, Your Honor, and it is one of the documents that was executed. V.J. Designs signed a... I thought the whole point, I may be misunderstanding it, is that they're contending there's two steps. Transfer the license. That's just independent of when Forevermark may or may not get comfortable. Then something else happens at that point depending on whether they get comfortable. There is no second step, Your Honor. It was never pled. It was never argued. It wasn't the state of the evidence at the conclusion of the trial. The step one and the initial step was that this joint venture would be formed, that Forevermark had agreed that their licensee would retain the license. But as long as they had 51 percent of the joint venture, then this joint venture would have the ability to manufacture and to sell Forevermark jewelry, diamonds, and products. As I said, that's premised upon V.J. Designs retaining the license. They did not want to allow V.J. Designs to transfer the license to Cobb until they became comfortable, as they used that language, with Cobb as an operating entity. Was there any discussion about what that meant, what the comfort level was? Was there any objective criteria for analyzing when somebody would get comfortable with someone else? No, there was no objective or criteria set. Was there any discussion at all? There were discussions, Your Honor, that were attended as part of Cobb doing its due diligence, and the court made reference to that. They had meetings in Greenwich, Connecticut with a couple of Forevermark executives, and the state of the evidence at the trial was that they said that they would, they being the Forevermark representatives, said that they would need to become comfortable with Cobb before they would allow one of their licensees, in this case V.J., to transfer the Forevermark license to another entity, Cobb. So they never defined comfortable, and I assume they just wanted to see what their business practices were. My understanding, not my understanding, the state of the evidence on the record is that at that meeting, Mr. Lichtenfels, who is the owner and president of Cobb, came and talked about how he, because of his existing jewelry business, he would have access to PXs on military bases and Costco, and that he was going to put millions of dollars into developing the Forevermark line within his own business, and I think they wanted to see if one of that was going to happen. I don't know what they wanted to see. They didn't say what they wanted to see. All they said is we need to become comfortable with all these things you're telling us and with you as an operating business enterprise. Yes, Your Honor. The license, just independent of what the parties agreed to, it is, in fact, the case, I think, unless you tell me I'm wrong, that the license could have been transferred at a time when the 51 percent ownership had not been assumed. That's not true, Judge. I say it respectfully. No, that's... There's no way those two... The only way that license can be transferred, and this was in the... is with the explicit written consent of Forevermark USA. I didn't ask that. I didn't say whether they had to approve the transfer of the license.  I asked could the transfer of the license occur in a circumstance where the plaintiff had not assumed ownership of the 51 percent interest. The answer is... Yes. I mean, I'm trying to understand the question because I don't think I am and I apologize to you for that. I'm just trying to parse this sentence in the district court's opinion because it says, the plaintiff was to assume ownership of Vijay's 51 percent interest in Cobb Vijay for no cost, and then she emphasizes after Forevermark becomes comfortable with WRC. So that's one thing that has to happen. Right, correct. And that can only happen on the contingency of Forevermark becoming comfortable. And given written consent. Yes, go ahead. Then there's a second thing. If the license was to be transferred at the execution of the agreement, there would be no reason for that provision. That may or may not be true. I'm just asking a different question. Would it be possible for the license to be transferred even if the ownership of the 51 percent interest was never assumed? With the permission of Forevermark only.  And so I think since that's true, I guess that's the way the gap is, if I'm understanding the appellant's argument as to where there's a potential problem in the analysis in the district court opinion. Maybe it's not a problem, which is that the contract, as she construes it, we know that the transfer didn't have to occur until Forevermark became comfortable because of this provision saying that ownership wouldn't be assumed until they became comfortable. If I'm understanding it, appellants are saying that's not a good construction of the contract. That's a separate provision about ownership. It was just a separate reason through other provisions to assume or conclude that the transfer of the license had to occur earlier. Isn't that their argument? I think their argument, Judge, is that my client was supposed to transfer the license from VJ Designs, LLC, to the new joint venture entity that was created and that they thought that would happen or could happen without the permission or consent or written permission or assent. That's the key here, Judge, for my client's ability to do. He can't sell the license. I'm just trying to find what text in the contract either of you are relying on in making your arguments. When I look at the district court opinion, the text the district court seems to seize on in supporting your position is this provision about ownership couldn't be assumed until Forevermark becomes comfortable. Then I think they're saying that doesn't speak to the question of when the license can be transferred. So you have to look at other provisions. So are there other provisions that suggest your position is right or are you staking your position on this becomes comfortable provision? Additional provisions. What are the other provisions that support it? I think that what the court is talking about, if I can just bump backwards a little bit, I think what the court is talking about is that there was no agreement between the parties that the license would be transferred to Cobb or one of his entities. And one of the things that the court looked to was that pursuant to provision of the contract, in addition to the joint venture being able to purchase Forevermark products from VJ Designs, because they still have the license, VJ Designs would be able to sell off whatever other inventory that they had, subject to the approval of Mr. Lichtenfeld, that's in the contract, and that may be minutia as far as what we're talking about. But the only way that VJ Designs could continue to sell Forevermark products is if they retained the license. And the judge, I believe, respectfully, I believe the judge notes that in terms of her interpretation. And another part of her interpretation is she goes to the preamble, which counsel started to read to you, where the parties seem to separate that we're going to operate this joint venture and certain assets are being bought. And the claim throughout the trial was that an asset that was being bought was the Forevermark license. And from 2016 forward, this isn't something that happened over a couple weeks in the summer of 2018, but from 2016 forward, Mr. Lichtenfeld and his company had continually explored how and they could get their access to the Forevermark license, because the Forevermark license had a great deal of value to a jeweler. They charged a premium. There were only 20 of them, at least at the time it was issued to my client in the United States. This is all part of the record. My client is a, you know, he owns a small business in Manhattan in the Diamond District himself and one of his sons working there. The Cobb was a good size. I think they described themselves as nationally a medium-sized jewelry company. And they thought that they could take this license that this small-time jeweler had and turn it into something, and they wanted it. And they kept it for a couple years. They went after it until he created this joint venture. And the only thing that he needed to do, he being Mr. Lichtenfeld, the owner, president of Cobb, was to allow Forevermark to be comfortable with him, whatever that word meant, you know, and his business practices, and therefore he would have the ability to, you know, the contract would have gone forward. And, you know, I think what's incredibly important in terms of the court's decision is they find that, the court found that Mr. Lichtenfeld abandoned the joint venture three months after it was created, August of 2018, and the document was signed on May 30th, 2018. And that's why the court found that he had, in fact, and not my client, had breached the contract. But to my client, the plain language of the contract was that this Forever, this need to get comfortable language, the fact that the purchase orders would have to go to VJ Designs because they still held the license, because VJ Designs would be able to sell their own product, excuse me, sell Forevermark product independent of the joint venture, you know, again, subject to the approval of Mr. Lichtenfeld, all indicates that the parties knew that VJ Designs would retain the license and that it wasn't to be transferred. And adding to that, and I think so significantly, is this assignment agreement undated that the contract required Mr. Lichtenfeld only to sign, and the idea was that once they, you know, transferring his 51% interest, the 51% being what Forevermark utilized or allow, why Forevermark allowed the joint venture to manufacture and market their products, that that would need to be, you know, it was undated, it's unsigned, and if at some point, that was the plan. That's what Mr. Lichtenfeld came up with after months, excuse me, after a couple plus years of trying to obtain the Forevermark license that was held by VJ Designs. I can get into the rescission if you want, if you think it's necessary, I can get into whatever else you want. It seems I have two minutes left. Any further questions? But I think I've responded to your questions, folks. Thank you. Okay. Thank you for listening to me. Thank you, counsel. At this time, counsel for the appellant has a two-minute rebuttal. Please reintroduce yourself on the record to begin. Robert Fine for the appellant. If there was no transfer of the license, then the joint venture could make no sales of Forevermark product, and that was the whole purpose of this joint venture, that failed business arrangement. VJ was going to own and did own 51% of the joint venture, and again, the idea was that at some point in the future, the plaintiff was to assume ownership of VJ's 51% interest after Forevermark became comfortable with WRCOP. It was not going to be a transfer of the license under this agreement. That's not what the agreement said. It was a two-step process. The joint venture And where's the best language for you in the contract that indicates that the license transfer had to occur earlier or immediately? Well, at the first page, it says that the joint venture would operate the Forevermark business under the Forevermark license, and the joint venture was owned 51% by VJ Designs. The comfort was going to happen later. My brother made one point regarding inventory sales. VJ Designs had approximately $200,000-plus worth of inventory. They could have made sales. It did not have to be Forevermark stamped product, and that would reduce what had already been paid, and again Just to make sure I understand, at some point, is there agreement the license... Would the license have to have been transferred after Forevermark became comfortable? On their theory, I guess no, even. On their theory, it never would have had to have been transferred. You could have had the whole thing go, and there never would have had to have been a transfer of the license. It would have been held by the joint venture, which could have gone on forever with the profit-sharing arrangement that was within and set out for under the contract. Thank you. While I have just a few seconds left, the upshot was that the defendants kept the $290,000 that had been paid by WR Cobb. I don't understand. At this point, what you're alleging is the breach. You're acknowledging that Forevermark had to approve, and they didn't. What is the breach? Well, we thought that they had approved, but Mr. Ghalili, who said that the joint venture was going to be holding the license, he never did transfer the license, and that was one of the breaches, and there were other misrepresentations, such as with the dash. The district court found, as a matter of fact, on the negligent misrepresentation claim that your client was not credible, and that there had been no negligent misrepresentation. And why is that error? Well, that point was that you ---- Credibility findings are routinely upheld by this court. And I well understand that. But if you look to the document, the testimony, Mr. Lichtenfeld said he thought there was a communication, and the judge said there was no document, and the communication is different from the document. In addition, under the ---- Well, I don't know that ---- I think that ends the argument. I don't believe that there was a document to produce when Mr. Ghalili said the joint venture was to hold the license. It was your client who said there was a document. No, well, I ---- You just said that. I hate to disagree. No, he said there was a communication, and I don't believe that there was a document, and certainly there was no document to produce. And I'm sorry to be quibbling with you, and I know I shouldn't, but the ---- That's correct. The communication, he said he believed there was a communication. Why don't you just close?  Give me 10 seconds and just ---- Any last statement you made or you've done? Well, with that admonition, I am concluding my arguments. Thank you very much. Thank you very much. Thank you. Thank you, counsel.